1 | GEORGE S. CARDONA
Acting United States Attorney
2 | CHRISTINE C. EWELL
Assistant United States Attorney
3 | Chief, Criminal Division
JILL FEENEY (Cal. Bar No. 218506)
4 | Assistant United States Attorney
Deputy Chief, Major Frauds Section
5 | RUTH C. PINKEL (Cal. Bar No. 166470)
Assistant United States Attorney
6 | Deputy Chief, General Crimes Section
1100/1200 United States Courthouse
7 | 312 North Spring Street
Los Angeles, California 90012
8 | Telephone:  (213) 894-2429/6077
Facsimile:  (213) 894-0141
9 | Email:      jill.feeney@usdoj.gov/ruth.pinkel@usdoj.gov

10 | Attorneys for Plaintiff
UNITED STATES OF AMERICA

11

12 |                   UNITED STATES DISTRICT COURT

13 |            FOR THE CENTRAL DISTRICT OF CALIFORNIA

14 | UNITED STATES OF AMERICA,       ) CR No. 06-479-AHM
                                    )
15 |            Plaintiff,           ) GOVERNMENT'S SENTENCING
                                    ) POSITION; GOVERNMENT'S
16 |            v.                   ) RESPONSE TO DEFENDANT CURTIS
                                    ) SOMOZA'S SENTENCING POSITION;
17 | CURTIS D. SOMOZA,               ) DECLARATIONS
                                    )
18 |            Defendant.          ) SENTENCING DATE: 11/2/09
                                    ) SENTENCING TIME: 3:00 p.m.
19 |                                 )
                                    )
20 |                                 )
                                    )
21 | _____ )

22

23 |        Plaintiff United States of America, by and through its

24 | counsel of record, Assistant United States Attorneys Jill Feeney

25 | and Ruth C. Pinkel, hereby files its sentencing position  and

26 | relating to defendant CURTIS D. SOMOZA ("defendant") and its

27 | response to defendant's sentencing position.

28 |        The government's position regarding sentencing and is

response to defendant's sentencing position is based upon the attached memorandum of points and authorities, the files and records in this case, the Presentence Report, the government's previously filed Concurrence With the Presentence Report, filed October 6, 2009, the Declarations of Ruth C. Pinkel, Nicole Berlowitz and Robert Coberly, and attached exhibits, and any other evidence or argument that the Court may wish to consider at the time of sentencing.

DATED: October 26, 2009          Respectfully submitted,

                                 GEORGE S. CARDONA
                                 Acting United States Attorney

                                 CHRISTINE C. EWELL
                                 Assistant United States Attorney
                                 Chief, Criminal Division


                                 _____*Ruth C. Pinkel* /s/_____
                                 JILL FEENEY
                                 RUTH C. PINKEL
                                 Assistant United States Attorney

                                 Attorneys for Plaintiff
                                 United States of America

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . iii

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . 1

II.  SUMMARY OF DEFENDANT'S SENTENCING POSITION . . . . . . . 2

III. UNDERLYING CRIMINAL CONDUCT . . . . . . . . . . . 3

     A.   The Scheme to Defraud . . . . . . . . . . . 3

     B.   The Prior Securities and Exchange Commission
        Investigation . . . . . . . . . . . . . . 4

     C.   Somoza's Solicitation of an Additional $20 Million
        from Ardinger . . . . . . . . . . . . . . 5

     D.   The Life Insurance Investment . . . . . . . . . 5

IV.  THE PROPOSED SENTENCING ENHANCEMENTS ARE PROPERLY APPLIED
     TO DEFENDANT . . . . . . . . . . . . . . . . 6

     A.   Defendant Defrauded over 50 Victims Which Resulted
        in a $44 Million Loss . . . . . . . . . . . 7

     B.   An Abuse of Position of Trust Enhancement Should
        Be Applied to Defendant Who Held Himself Out To
        His Victims As an Experienced Investment Advisor
        and Bond Trader . . . . . . . . . . . . . 10

     C.   Defendant Is Eligible for A Two-Level Enhancement
        for His Role As an Organizer and Leader . . . . . 12

     D.   Defendant Utilized Sophisticated Means in Both
        Defrauding His Victims and Lulling Them Into
        Complacency . . . . . . . . . . . . . . 14

     E.   Defendant Obstructed Justice During an SEC
        Investigation and Multiple Times in A Civil Lawsuit
        Filed By One of His Victims . . . . . . . . . 17

          (1)  Suborning Perjury/False Document Submitted
             During SEC Investigation . . . . . . . 18

          (2)  Two Separate Instances of Perjury/Suborning
             Perjury During Bruinbilt Arbitration . . 18

     F.   Defendant Has Not Accepted Responsibility . . . . 19

i

## <u>TABLE OF CONTENTS (CONTINUED)</u>

|  |  | **PAGE** |
|---|---|---|
| V. | ANALYSIS OF THE SECTION 3553(a) FACTORS . . . . . . . . | 22 |
| | A. <u>18 U.S.C. § 3553(a)(1)</u> . . . . . . . . . . . . | 22 |
| | B. <u>18 U.S.C. § 3553(a)(2)</u> . . . . . . . . . . . . | 25 |
| | C. <u>18 U.S.C. § 3553(a)(6)</u> . . . . . . . . . . . . | 25 |
| | D. <u>The Remaining 3553(a) Factors Also Support The Sentence Requested by the Government</u> . . . . . | 26 |
| VI. | CONCLUSION . . . . . . . . . . . . . . . . . . . . | 26 |

ii

## TABLE OF AUTHORITIES

**FEDERAL CASES:**                                                      **PAGE(S)**

United States v. Contreas,
     581 F.3d 1163 (9th Cir. 2009) . . . . . . . . . . . .   10

United States v. Dare,
     425 F.3d 634 (9th Cir. 2005) . . . . . . . . . . . .   7

United States v. Espinoza-Cano,
     456 F.3d 1126 (9th Cir. 2006) . . . . . . . . . . . .   20

United States v. Felix,
     561 F.3d 1036 (9th Cir. 2009) . . . . . . . . . . . .   6

United States v. Fellows,
     157 F.3d 1197 (9th Cir. 1998) . . . . . . . . . . . .   21

United States v. Garro,
     517 F.3d 1163 (9th Cir. 2008) . . . . . . . . . . . .   15

United States v. Jordan,
     256 F.3d 992 (9th Cir. 2001) . . . . . . . . . . . .   7

United States v. Mezas de Jesus,
     217 F.3d 638 (9th Cir. 2000) . . . . . . . . . . . .   7

United States v. Nielsen,
     371 F.3d 574 (9th Cir. 2004) . . . . . . . . . . . .   22

United States v. Rivera,
     527 F.3d 891 (9th Cir. 2008) . . . . . . . . . . . .   12

United States v. Schales,
     546 F.3d 965 (9th Cir. 2008) . . . . . . . . . . . .   21

United States v. Scrivener,
     189 F.3d 944 (9th Cir. 1999) . . . . . . . . . . . .   21

United States v. Showalter,
     569 F.3d 1150 (9th Cir. 2009) . . . . . . . . . . . .   8

United States v. Thornton,
     511 F.3d 1221 (9th Cir. 2008) . . . . . . . . . . . .   10

United States v. Valensia,
     222 F.3d 1172 (9th Cir. 2000) . . . . . . . . . . . .   7

iii

### TABLE OF AUTHORITIES (CONTINUED)

**FEDERAL STATUTES**:                                              **PAGE(S)**

18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 1341 . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 1957 . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . passim


**UNITED STATES SENTENCING GUIDELINES**:

U.S.S.G. § 3B1.3 . . . . . . . . . . . . . . . . . 10, 11

U.S.S.G. § 2B1.1(b) . . . . . . . . . . . . . . . . 8, 9

U.S.S.G. § 2B1.1(b)(9)(C) . . . . . . . . . . . . . 14, 15

U.S.S.G. § 3B1.1(c) . . . . . . . . . . . . . . . .12, 13

U.S.S.G. § 3C1.1 . . . . . . . . . . . . . . . . . . 17

U.S.S.G. § 3E1.1 . . . . . . . . . . . . . . . . . 20, 21

1                    **MEMORANDUM OF POINTS AND AUTHORITIES**

2   **I.    INTRODUCTION**

3        On June 13, 2006, a federal grand jury returned a twenty-

4   seven count indictment against defendants Curtis Somoza and

5   Robert Coberly, charging them with conspiracy, wire fraud, mail

6   fraud, promotional money laundering, transactional money

7   laundering, and criminal forfeiture.  The indictment alleged that

8   from approximately July 2003 through late 2004 defendants Somoza

9   and Coberly raised approximately $68.7 million from over 70

10  investors for placement in a purported bond-trading program and

11  for investments in pools of life insurance policies.

12       Trial against Somoza commenced on October 21, 2008.  On the

13  second day of trial, Somoza pled guilty without a plea agreement,

14  to nineteen counts in the indictment as follows:  Count One, 18

15  U.S.C. § 371 (Conspiracy); Counts Two through Seven, 18 U.S.C. §

16  1343 (Wire Fraud); Counts Eight through Eleven, 18 U.S.C. § 1341

17  (Mail Fraud); and Counts Fifteen to Seventeen, Twenty-Two and

18  Twenty-Four, 18 U.S.C. § 1957 (Transactional Money Laundering).

19  In addition, Somoza agreed to the forfeiture as set forth in

20  Counts Twenty-Six and Twenty-Seven.

21       The Presentence Investigation Report ("PSR") was disclosed

22  to the parties on September 22, 2009.  On October 6, 2009 the

23  government filed its concurrence with United States Sentencing

24  Guidelines ("U.S.S.G.") guidelines calculations set forth in the

25  PSR.  (CR 369)

26       The government respectfully requests that the Court adopt

27  the following guidelines calculations as set forth in the PSR for

28  defendant:

```
Base Offense Level   :     7    [U.S.S.G. § 2B1.1(a)(1)]

Loss
(More than           :    +22   [U.S.S.G. § 2B1.1(b)(1)(M)]
$22 million)

50+ Victims          :    +4    [U.S.S.G. § 2B1.1 (b)(2)(B)]

Sophisticated Means  :    +2    [U.S.S.G. § 2B1.1 (b)(9)]

Role                 :    +2    [U.S.S.G. § 3B1.1 (c)]

Abuse of Position
of Trust             :    +2    [U.S.S.G. § 3B1.3]

Obstruction          :    +2    [U.S.S.G. § 3C1.1]

Acceptance of
Responsibility       :     0    [U.S.S.G. § 3E1.1]
```

The total offense level is therefore 41.

The government concurs with the Criminal History calculation set forth in defendant's PSR: namely, that the defendant has a criminal history of I. This results in an advisory guidelines range of 324-405 months. Based upon the factors set forth in 18 U.S.C. § 3553(a), the government agrees with the PSR and respectfully submits that a 27-year period of incarceration, a five year term of supervised release, a $1,900 special assessment, and a restitution order of $44,495,969 is appropriate for this defendant based upon his criminal conduct in this case.

**II.   SUMMARY OF DEFENDANT'S SENTENCING POSITION**

In his Sentencing Position Paper, defendant objects to all factual assertions in the PSR. (Defendant's Sentencing Position Paper at 6). He argues that the government has failed to prove the applicability of any of the sentencing enhancements and that a 60 month sentence is appropriate for defendant after consideration of the relevant factors under 18 U.S.C. § 3553(a).

2

(Defendant's Sentencing Position Paper at 2-3).  For the reasons
set forth below in Section IV, defendant's arguments are without
merit and all enhancements recommended by the USPO should be
imposed.

**III.  UNDERLYING CRIMINAL CONDUCT**

    **A.   <u>The Scheme to Defraud</u>**

The indictment alleges that the defendants engaged in an
approximately three year scheme to defraud which consisted of
soliciting investors for two main investments: (1) a bond trading
program and (2) an investment in premiums for life insurance
pools for members of an African-American church group in South
Los Angeles.  Of the approximately $64 million raised from
investors for these purposes, only approximately $4.7 million was
used to make life insurance premium payments and no bonds were
purchased for the investors' benefit.  (PSR ¶ 3).

Solicitation of investors took place primarily through word
of mouth and either telephonic or in-person meetings between
investors and Somoza and/or Coberly.  Up until July 2004,
investors were given either "loan agreements" or letters
memorializing a "loan" to Somoza and Coberly's living trusts.
Investors were promised that their money would be used for bond
trading or insurance pools.

Starting in the Summer of 2004 investors were solicited to
convert their personal "loans" to Somoza and Coberly into units
in various Limited Liability Corporations, all utilizing the name
Persistence Capital in some fashion, which were set up by Somoza
and Coberly.  The LLCs were purportedly going to use investor
funds to invest in pools of life insurance.  Investors were

3

initially told that they would receive a return of their original investment principal which they then had the option of re-investing to purchase units in the LLCs.  Later, investors were merely told that they had been "converted" to units in the LLC. (PSR ¶ 23).

    During the course of the scheme, among other things, investors were misled about the following: the proposed and actual use of their funds; the productivity of the so-called bond trading; and the alleged past success of Somoza and Coberly.

**B.    The Prior Securities and Exchange Commission Investigation**

    In addition, from approximately September 2002 to May 2003, Somoza and Coberly offered and sold approximately $6.7 million worth of fraudulent "prime-bank" note investments to approximately 50 investors.  Investors were promised an extremely high rate of return; however, Somoza and Coberly invested very little of the funds with the third party allegedly running the bond program.  Instead, Somoza and Coberly utilized the majority of investor funds to support their extravagant lifestyles and to make "interest" payments to investors.  (PSR ¶ 11).

    In April 2003, the Securities and Exchange Commission ("SEC") began investigating Somoza and Coberly's then-companies, RC Investments and Pinnacle Investment Corporation.  In order to remove himself and Coberly from the SEC's scrutiny, by July 2003, Somoza had solicited $5 million from Horace Ardinger a wealthy Dallas, Texas businessman.  Somoza told Ardinger the $5 million was for bond trading and did not tell Ardinger about either the SEC's investigation or Somoza's intention to use Ardinger's $5

million to repay the RC and Pinnacle investors.  (PSR ¶ 12),

Somoza and Coberly convinced RC/Pinnacle investors to sign settlement agreements with them and then repaid them with "interest" with Ardinger's money.  Coberly convinced many of the investors to reinvest with him and Somoza.  (PSR ¶ 13).

The SEC eventually filed a civil suit against Somoza and Coberly entitled <u>SEC v. RC Investment Corp. et al.</u>, Case No. CV - 04-7400-GHK (Ex).  The SEC later settled the case with Somoza and Coberly.  (PSR ¶¶ 12, 14).

**C.**   **Somoza's Solicitation of an Additional $20 Million from Ardinger**

Somoza solicited an additional $5 million from Ardinger in October 2003 and another $5 million from Ardinger in December 2003.  Somoza told Ardinger the October $5 million investment would be placed in a certificate of deposit which would be used as collateral for additional bond trading.  Somoza told Ardinger that the December $5 million investment was for investment in life insurance pools as described below.  (PSR ¶ 15).

Finally, in March 2004, Somoza solicited a final $10 million investment from Ardinger and told Ardinger that the funds would be invested in the life insurance pools described below.  (PSR ¶ 17).

**D.**   **The Life Insurance Investment**

In late 2003, Somoza and Coberly began telling prospective investors about a new investment program into life insurance pools purchased on behalf of members of the Personal Involvement Center ("PIC"), an African-American church-based organization run by the senior pastor at the Praise of Zion Baptist Church in

5

South Los Angeles.  (PSR ¶ 18).

Investors were told of the charitable aspects of the investment and that the investors' funds would be used, in part, to further those charitable activities, including paying for the burial costs of PIC members who were insured as part of a life insurance pool.  (PSR ¶ 21).

Somoza and Coberly told investors that their funds would be used to pay for the life insurance premiums for pools of life insurance covering approximately 1,200 or more people from the PIC.  The policies, issued by Transamerica Occidental Life Insurance Company ("Transamerica"), had a face value of $275,000. Upon the death of an insured, $15,000 would be paid to the insured's family (presumably for burial expenses), $20,000 would go to the PIC and the remaining $240,000 would go back to Persistence Capital.  (PSR ¶ 19).

Somoza and Coberly did not tell investors that they were using their funds to repay other investors and to support their own extravagant lifestyles.  Somoza and Coberly also did not tell investors that the vast majority of the invested funds did not go to either the bond trading or the life insurance premiums.

IV.     **THE PROPOSED SENTENCING ENHANCEMENTS ARE PROPERLY APPLIED TO DEFENDANT**

Despite defendant's objections, all sentencing enhancements recommended by the USPO are applicable to defendant and should be imposed in this case.

Generally, the preponderance of the evidence standard applies to factual findings made by a court at sentencing. United States v. Felix, 561 F.3d 1036, 1045 (9th Cir. 2009);

<u>United States v. Dare</u>, 425 F.3d 634, 642 (9th Cir. 2005).
However, when the application of a particular sentencing factor
has "an extremely disproportionate effect on the sentence
relative to the offense of conviction," then the applicable
standard of proof may be clear and convincing evidence.  <u>United
States v. Mezas de Jesus</u>, 217 F.3d 638, 642 (9th Cir. 2000).  To
determine whether there is an extremely disproportionate impact,
courts apply a totality of the circumstances test.  <u>United States
v. Jordan</u>, 256 F.3d 992, 928 (9th Cir. 2001); <u>see also</u> <u>United
States v. Valensia</u>, 222 F.3d 1172, 1182 (9th Cir. 2000)(setting
forth six factors courts may consider in determining whether
there is an extremely disproportionate impact from the
application of a sentencing factor).

In this case, defendant argues that the government should be
required to prove the amount of fraud loss by clear and
convincing evidence.  (Defendant's Sentencing Position Paper at
10).  Given that the amount of loss in this case increases
defendant's base offense level by 22 levels, the government
agrees that the clear and convincing standard should apply to the
application of this specific offense characteristic.

A.    <u>**Defendant Defrauded over 50 Victims Which Resulted in a
$44 Million Loss**</u>

In contesting the enhancements for loss and the number of
victims, defendant claims that there was no forensic accounting
analysis in this case.  (Defendant's Sentencing Position at 11-
12).  However, the government produced to defendant approximately
sixty-eight spreadsheets of its extensive financial analysis two
months prior to the October 2008 trial in this case.

7

(Declaration of Ruth C. Pinkel ("Pinkel Dec.") ¶ 2, Exhibit 1).

Those spreadsheets contained a column which specifically listed

each of the underlying bank records by government bate number.

(Id. ¶ 2, Exhibit 2).  In addition, two days before trial, the

government produced to defendant all of its trial exhibits,

including final versions of the approximately forty-one

spreadsheets it intended to use at trial along with approximately

thirty-eight summary charts which summarized the data and

transactions contained in those spreadsheets.  (Id. ¶ 3, Exhibit

3).  Finally, loss and restitution spreadsheets were

simultaneously produced to defendant's present counsel and the

USPO on December 22, 2008. (Pinkel Dec, ¶ 4, Exhibit 4).  Those

same spreadsheets are attached hereto to the Declaration of

Nicole Berlowitz ("Berlowitz Dec.") as Exhibits A and B.

The commentary to U.S.S.G. § 2B1.1(b)(1) allows the court to

"estimate" monetary loss in assessing the proper sentencing

enhancement for loss.  U.S.S.G. § 2B1.1, Application Note 3(C).

The loss determination need not be made with "absolute

precision."  United States v. Showalter, 569 F.3d 1150, 1161 (9th

Cir. 2009).  In this case, however, the government has gone much

further than simply estimating the loss amount.  A Federal Bureau

of Investigation ("FBI") Financial Analyst has performed an

extensive financial analysis of bank accounts controlled by

defendant and Robert Coberly.  (Berlowitz Dec ¶¶ 3-6).  The

analyst determined that victim investors invested approximately

$64 million.  (Id. at ¶ 3).  Approximately $28 million in

repayments and payments were made to investors. (Id.).  After

giving credit for repayments to investors up to their original

8

1  investment amount, the analyst concluded that investors suffered

2  an actual loss of approximately $44.4 million.  (Id.).  This loss

3  amount does not include the approximately $3.9 million in

4  overpayments (part of the $28 million described above) which was

5  determined to be an overpayment to an investor above their

6  original investment.  A defendant does not receive credit towards

7  restitution for payments to investors that were above their

8  original investment amount.  U.S.S.G. § 2B1.1, Application Note 3

9  (F)(iv).

10      A victim is anyone who "sustained any part of the actual

11  loss determined" under the guidelines.  U.S.S.G. § 2B1.1,

12  Application Note 1.  In this case, through its financial

13  analysis, the government has determined there are 64 victims who

14  sustained actual loss.  The victim identities was derived from a

15  list of investors that was compiled by reviewing bank records and

16  by confirming the list with Coberly who had first-hand knowledge

17  of the identities of investors in this case.[1]  (Berlowitz Dec. ¶¶

18  3-5, Exhibits A & B; Declaration of Robert Coberly ("Coberly

19  Dec.") ¶¶ 5-6,11-12, Exhibits A & B).  In addition, the USPO

20  received victim impact statements from 30 victims.  (PSR ¶ 32,

21  75).

22      Through its financial analysis, the government has

23  demonstrated by clear and convincing evidence that 64 investors

24  incurred a total actual loss of $44.4 million.  Thus, a 22 level

25

26      [1]The government also interviewed a large number of victims
   in this case and produced those interview reports to defendant.
27  However, for the purposes of streamlining its proof of victim
   identity for the sentencing, it relies upon the Berlowitz and
28  Coberly declarations and attached exhibits.

increase in the base offense level for loss and a 4 level

increase for over 50 victims is properly applied to defendant.

**B.** **An Abuse of Position of Trust Enhancement Should Be Applied to Defendant Who Held Himself Out To His Victims As an Experienced Investment Advisor and Bond Trader**

Defendant argues that the abuse of position of trust enhancement should not be applied to him because he contends that government has not proven the requirements for its imposition. (Defendant's Sentencing Position Paper at 9).

Sentencing Guideline § 3B1.3 provides for a two-level increase "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." Application Note 1 to U.S.S.G. § 3B1.3 describes a position of "public or private trust" as being "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." There is no requirement of a fiduciary relationship between the defendant and his victim. United States v. Thornton, 511 F.3d 1221, 1227 (9th Cir. 2008). Instead, the focus of the inquiry is whether or not the defendant was in a position that involved professional or managerial discretion. United States v. Contreas, 581 F.3d 1163, 1165 (9th Cir. 2009).

Application Note 3 states the enhancement applies in a case in which "the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust, when, in fact, the defendant does not. For example, the adjustment applies in the case of a defendant who

10

perpetrates a financial fraud by leading an investor to believe
he is a legitimate investment broker." The enhancement is
applicable where: "In making the misrepresentation, the defendant
assumes a position of trust, relative to the victim, that
provides the defendant with the same opportunity to commit a
difficult-to-detect crime that the defendant would have had if
the position were held legitimately." U.S.S.G. § 3B1.3,
Application Note 3.

In this case, defendant held himself out to investors as an
extremely successful bond trader who had amassed more than $300
million in profits. (Coberly Dec., ¶ 6). In both phases of his
scheme to defraud, that is in soliciting investors for both the
bond trading and the life insurance investments, defendant
represented to investors that he had a special expertise and was
highly successful. (Coberly Dec. ¶ 14; Pinkel Dec. Exhibit 5 at
p. 1 (Ardinger FBI 302s 12/30/05); Pinkel Dec. Exhibit 8 at 2-3
(Cyndee Howard FBI 302 10/9/08)). He promised investors he would
place their money in a specialized investment and amass large
rates of return for them. (Id.). In addition, Somoza's position
vis-a-vis investors gave him unfettered discretion to spend their
money on himself, which he did with reckless abandon to the tune
of $27 million. (Berlowitz Dec. ¶ 8). There were no auditors or
accountants tracking Somoza's expenditures and reporting back to
investors. (Coberly Dec. ¶ 13). Similarly, investors were not
given any statements showing how their funds were actually spent.
(Id.)

In addition, as described more fully in Section E, below,
Somoza's use of multiple shell entities gave his investments both

the aura of legitimacy--they sounded like real companies--and served to hide his actions from investors as he moved funds from account to account.

An abuse of position of trust enhancement is more than warranted by the facts of this case.

### C.   **Defendant Is Eligible for A Two-Level Enhancement for His Role As an Organizer and Leader**

Defendant argues that the two-level role adjustment applied in the PSR is not applicable because the government has not met its burden of proof with respect to the application of this adjustment and because defendant's role in the offense was equal to that of his co-defendant, Coberly.  Both arguments fail.

Under the Sentencing Guidelines, a defendant who was "an organizer, leader, manager, or supervisor in any criminal activity" qualifies for a two-level adjustment based on his role in the offense.  U.S.S.G. § 3B1.1(c).  A defendant qualifies for this adjustment if he was "the organizer, leader, manager, or supervisor of one or more other participants."  U.S.S.G. § 3B1.1, Application Note 2.

To establish this adjustment, the government must demonstrate that a defendant had control or organizational authority over others.  <u>United States v. Rivera</u>, 527 F.3d 891, 908 (9th Cir. 2008).  Although in this case, the court need not decide if defendant was a leader or organizer, as opposed to a manager or supervisor, the factors to be considered in that analysis are useful tools in analyzing the instant case.  Such factors include "the exercise of decision making authority, the nature of participation in the commission of the offense, the

recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."  U.S.S.G. § 3B1.1, Application Note 4.

In this case, there can be no doubt that defendant occupied a position of leadership and control vis-a-vis his co-defendant Coberly.  Defendant contends that the factual basis for defendant Coberly's plea agreement establishes the equality of roles between the two defendants.  However, proving defendant Somoza's role in the offenses was not the purpose of the factual basis contained in defendant Coberly's plea agreement.  Hence, relying on that factual basis to establish that defendant Somoza did not occupy a supervisory position is nonsensical.

Defendant Somoza instigated the fraud scheme and was responsible for soliciting the victim who lost the largest amount from the fraud scheme, Horace Ardinger.  Defendant Coberly was not initially aware of Ardinger and how Somoza had solicited him for funds.  (Coberly Dec. ¶¶ 8, 10).  Horace Ardinger, an elderly man from Texas, invested $25 million with Somoza and ended up losing over $21 million.  (Exhibit A to Berlowitz Dec.).  Ardinger dealt with Somoza and it is Somoza who made the fraudulent representations to him that his money would be invested in bonds and insurance pools.  (Pinkel Dec., Exhibit 5 (12/30/05, 6/7/06, 9/8/08 FBI 302s of Horace Ardinger)).  In fact, the lionshare of Ardinger's money went to Somoza.  (Berlowitz Dec, Exhibit C: Trial Exhibits 380-384).

Defendant Somoza's dealings with Ardinger are illustrative

of his leadership and supervisory position as compared to defendant Coberly.  Defendant Somoza instigated the fraudulent scheme and indeed defrauded Ardinger largely by himself. Defendant Somoza directed and controlled how the fraudulently obtained funds from Ardinger would be spent, getting the bulk of the money for himself.

As with the Ardinger example, this pattern repeated itself throughout the course of the fraud.  Defendant Somoza directed defendant Coberly to solicit others to invest in the insurance pools and directed Coberly as to how investor funds should be disbursed. (Coberly Dec. ¶ 13).

Perhaps the most definitive proof of defendant Somoza's leadership position is how the proceeds of the fraud were divided.  Of the approximately $64 million obtained from investors, defendant Somoza received $27,430,017 of those funds while defendant Coberly received $3,637,971.  (Berlowitz Dec., Exhibit D: Trial Exhibit 347).  In other words, defendant Somoza received 7 and ½ times more money from the fraudulent scheme than did defendant Coberly.  Equal partners in a crime do not divide the spoils in such an uneven manner.

    D.    **Defendant Utilized Sophisticated Means in Both Defrauding His Victims and Lulling Them Into Complacency**

Defendant contends that the government has failed to prove that the scheme in this case involved sophisticated means and hence, the two-level specific offense characteristic should not applied to his case.  As set forth below, there is ample proof that the scheme involved sophisticated means.

Pursuant to U.S.S.G. § 2B1.1(b)(9)(C), the applicable

14

Guideline Range should be increased by two-levels if the offense involved "sophisticated means." Sophisticated refers to "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1, Application Note 8(B). "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." Id. Other examples of sophisticated means include using "confusing and misleading" documents regarding the use of investor funds and avoiding having one's name on transactions or assets. See United States v. Garro, 517 F.3d 1163, 1169 (9th Cir. 2008).

Defendant Somoza's offense conduct employed sophisticated means in a variety of ways. First, investors were given a variety of documents during the fraud which were both confusing and misleading with respect to what would happen or had happened to their funds. For instance, a private placement memorandum was circulated to investors who had previously provided investments funds to defendants Somoza and Coberly believing that their funds had been invested in insurance pools. This memorandum, which was created by Loeb & Loeb, lended an air of credibility to the operations of Somoza and Coberly and was designed to further confuse investors as to what had happened to their monies. (Coberly Dec.¶ 15, Exhibit D: Private Placement Memo). In another example, after victim Horace Ardinger had invested all his money with defendant Somoza, defendant Somoza had Ardinger execute declarations falsely making it appear as if Ardinger had lent the funds to Somoza do with as defendant Somoza pleased, as

opposed to what Somoza had told Ardinger, that the funds would be invested in bonds/insurance pools. (Coberly Dec. ¶ 10, Exhibit B: Declaration of Ardinger).  Unbeknownst to victim Ardinger, this declaration was provided by defendant Somoza's attorneys to the Securities and Exchange Commission to prove that defendants Somoza and Coberly were using "clean" funds to pay off the victims of their first fraud. (Pinkel Dec., Exhibit 6: Government Trial Exhibit 81 (4/30/04 Fax from Chad Hummel, Esq. To Robert Tercero, Esq.); Coberly Dec. ¶¶ 8-10).  Similarly, sophisticated documents were used to hide the fact that defendants Somoza and Coberly were simply stealing the funds of Brad and Cindee Howard, additional victims of the fraud. (Pinkel Dec., Exhibit 7 (9/6/08 302 of Brad Howard and Attachments); Pinkel Dec., Exhibit 8 (10/9/08 302 of Cyndee Howard)).  The Howards lost their $7.5 million investment.  Their funds were used again, primarily by Somoza. (Berlowitz Dec. ¶ 9, Exhibit E: Government Trial Exhibits 390 and 392).

Additionally, defendant Somoza employed sophisticated means by moving investor funds through multiple accounts, including through the accounts of shell corporations. (Berlowitz Dec. ¶ 10).  This made the tracing of investor funds time consuming and difficult. (Id.).  Investor funds went through accounts in the names of Somoza and Coberly's Living Trusts; the Limited Liability Corporations they used for their household expenses: Sonic Properties and Stockwell Properties; RC Investments; Pinnacle Investments; Westland Capital; Persistence Capital LLC; Persistence Family I LLC; and Persistence Friends I LLC, among others.  (Id.).  The Persistence entities were shell corporations

formed by Coberly and Somoza and those acting on their behalf as part of the fraudulent scheme. (Coberly Dec. ¶ 16, Exhibit E: Incorporation Documents).

Based on the above, the government has met its burden of proof with respect to the use of sophisticated means in the commission and concealment of the offense.

**E.   Defendant Obstructed Justice During an SEC Investigation and Multiple Times in A Civil Lawsuit Filed By One of His Victims**

A two-level enhancement for obstructing or impeding justice is properly applicable for a defendant who "willfully obstructed or impeded, or attempted to obstruct of impede the administration of justice with respect to the investigation, prosecution or sentencing of" the offense of conviction under U.S.S.G. § 3C1.1. The obstructive conduct must relate to either the offense of conviction and any relevant conduct or to "a closely related offense."  U.S.S.G. § 3C1.1 (B)(i) and (ii).  Obstructive conduct that occurred prior to the start of the investigation of the instance offense of conviction may be covered by § 3C1.1 "if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." U.S.S.G. § 3C1.1., Application Note 1.

An obstruction of justice enhancement can be based upon conduct which constitutes "committing, suborning or attempting to suborn perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction." U.S.S.G. § 3C1.1., Application Note 4 (b).

In this case, during an underlying civil case and during the

SEC investigation of defendant's prior RC/Pinnacle Investments Fraud, defendant (1) committed perjury, (2) suborned perjury and (3) produced a false document or record during an official [SEC] investigation.  U.S.S.G. § 3C1.1, Application Note 4 (b) and (c). Each of these three things forms an independent basis for imposition of an obstruction enhancement.

> (1)   <u>Suborning Perjury/False Document Submitted During SEC Investigation</u>

As discussed in Section D, above, in March 2004, during the SEC investigation of Somoza for the RC/Pinnacle fraud, Somoza caused to be drafted a false declaration for Ardinger, an elderly investor, falsely stating that Ardinger loaned $5 million to Somoza in July 2003 for any purpose when, in reality, Somoza originally led Ardinger to believe he was investing Ardinger's first $5 million in bonds.  Somoza admitted to co-defendant Coberly that this declaration contained false information and Ardinger told the FBI that Somoza led him to believe he was investing in bonds.  (Coberly Dec. ¶¶ 8-10; Pinkel Dec. at Exhibit 5 at p. 1 (Ardinger 12/30/05 302)).  Somoza had Coberly prepare the declaration for the purpose of misleading the SEC into believing that the RC/Pinnacle investors had been repaid with funds not obtained by fraud.  (Coberly Dec. ¶ 10).  The declaration was then submitted to the SEC.  (Pinkel Dec. At Exhibit 6).

> (2)   <u>Two Separate Instances of Perjury/Suborning Perjury During Bruinbilt Arbitration</u>

In September 2004, shortly after Somoza and Coberly defrauded them, the Howards filed a lawsuit in the name of their company, Bruinbilt, seeking return of their funds.  During this

litigation, Somoza committed perjury and attempted to suborn perjury of another witness.  In particular, in September 2004, Somoza filed his own false declaration in opposition to the Howards application for a writ of attachment which sought the return of their $7.5 million investment.  In that declaration, Somoza falsely stated that the Howard's funds were still located in an Asset Max bank account and that he could not claim or control the funds. (Pinkel Dec. at Exhibit 9).  In reality, Somoza had already spent the Howard's money and knew it was no longer in the Asset Max account as of the date of his declaration.  (Berlowitz Dec. ¶ 9, Exhibit E).  To that end, he even sent two faxes to Asset Max in early and mid-August 2004 requesting that $2.5 million of the funds be wired to the Curtis Somoza Family Trust bank account.  (Pinkel Dec. at Exhibit 10: Government Trial Exhibits 66 and 67).

Finally, in preparation for depositions and the arbitration hearing that resulted from the Howard's lawsuit, Somoza asked an Asset Max principal, Dennis Carlston, to falsely testify that Asset Max sent the Howard's money to Somoza as a so-called "modeling fee."  Carlston refused to do so.  Pinkel Dec., Exhibit 11 at p. 11 (1/31/07 302).

A two-level enhancement for obstruction of justice is more than justified by Somoza's conduct.

### F.   Defendant Has Not Accepted Responsibility

Defendant Somoza contends that he is entitled to three points off for acceptance of responsibility.  He also contends that the government has acted in "bad faith" by refusing to move for the third acceptance point under Sentencing Guideline

§ 3E1.1(b).  Defendant's contentions are without merit.

Defendant's contention that the government somehow has acted improperly in denying him the third acceptance point defies explanation.  After all, defendant pled guilty after jury selection started in his trial, which was scheduled to last several weeks.  The government had prepared and provided to defense counsel almost 400 trial exhibits.  (Pinkel Dec. ¶ 3).  Morever, the government had spent substantial time preparing numerous witnesses to testify at the trial.

According to the terms of the Guideline, a defendant is only entitled to a third acceptance point "upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently." U.S.S.G. 3E1.1(b).  A defendant wishing to challenge the government's failure to move for this third point "has a threshold evidentiary burden to show unconstitutional motive, or arbitrary governmental action." United States v. Espinoza-Cano, 456 F.3d 1126, 1136 (9th Cir. 2006).  Under the facts of this case, where actual trial commenced in a complex fraud case which took several months to prepare to try, defendant has not and cannot meet his burden of proof in this regard.

With respect to the other two points, a defendant "who clearly demonstrates acceptance of responsibility for his offense" is entitled to these points.  U.S.S.G. § 3E1.1(a).

However, a defendant who pleads guilty is not entitled to acceptance of responsibility as "a matter of right." U.S.S.G. § 3E1.1, Application Note 3. Moreover, "a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility" U.S.S.G. § 3E1.1, Application Note 1(a).

In his sentencing papers, defendant has contested the application of every sentencing factor, including loss constituting relevant conduct, and only admits to the conduct that was the subject of his guilty pleas. Moreover, he did not accept responsibility when he was interviewed by the Probation Officer. (PSR ¶ 66).

Under these circumstances, defendant has not met his burden of proof with respect to proving that he is entitled to two points for acceptance of responsibility. United States v. Scrivener, 189 F.3d 944, 948 (9th Cir. 1999)(defendant has burden of demonstrating "clearly" that he has accepted responsibility). Defendant here has denied responsibility for any relevant conduct. Such conduct warrants the Court denying him any points for acceptance of responsibility. See United States v. Schales, 546 F.3d 965, 976 (9th Cir. 2008)(defendant's denial of relevant conduct is basis for denying credit for acceptance of responsibility).

Moreover, defendant Somoza has not demonstrated a shred of remorse for his actions. This also is a basis for denying him acceptance of responsibility. See United States v. Fellows, 157 F.3d 1197, 1202-03 (9th Cir. 1998) (court may consider "failure

1  to demonstrate contrition and remorse" when deciding whether a

2  defendant has accepted responsibility); <u>United States v. Nielsen</u>,

3  371 F.3d 574, 582 (9th Cir. 2004)("[t]o receive the two-point

4  downward adjustment, a defendant must at least show contrition or

5  remorse").

6       Here, defendant has shown no remorse or contrition.  All his

7  actions since pleading guilty have been at odds with any

8  contrition or remorse.  Defendant Somoza has filed a frivolous

9  motion to withdraw his guilty pleas in which he made false

10  accusations against his previous counsel and also, has filed a

11  frivolous motion to have the Court recused from this case.  He

12  has attempted to have harm come to his co-defendant, Robert

13  Coberly, by having his plea agreement disclosed to the inmates at

14  the Metropolitan Detention Center.  (Coberly Decl. ¶¶ 17-19).

15  He has not admitted responsibility to the probation officer or to

16  anybody else.  In short, he has not met his burden of proof on

17  this matter.

18  **V. ANALYSIS OF THE SECTION 3553(a) FACTORS**

19       The government believes that the factors set forth in 18

20  U.S.C. § 3553(a) would be fulfilled by a sentence of twenty-seven

21  years as recommended by the USPO.

22       **A.   <u>18 U.S.C. § 3553(a)(1)</u>**

23       18 U.S.C. § 3553(a)(1) requires the Court to consider the

24  nature and circumstances of the offense and the history and

25  characteristics of defendant.

26       The nature and circumstances of the offense in this case are

27  particularly abhorrent and warrant a very long sentence.

28  Defendant promised investors huge rates of return while falsely

representing that he was investing their money in an investment
with a charitable aspect, i.e. providing life insurance death
benefits for those who could not afford them.  The fact that
"underprivileged communities" were allegedly being helped by this
investment appealed to investors and caused, in part, at least
one investor to part with $7.5 million.  (Pinkel Dec., Exhibit 8
at 1-2 (Cyndee Howard 10/9/08 FBI 302)).  Another investor parted
with $10 million, in part, because he thought the insurance pool
investment, as pitched by Somoza was, "a worthwhile cause" and
was backed by a Reverend.  (Pinkel Dec., Exhibit 5, Ardinger
9/8/08 FBI 302 at p. 3)).  However, rather than invest funds as
promised to investors, Somoza used only $4.7 out of $64 million
on the promised investments.  The rest of the money was used to
furnish an extremely extravagant lifestyle for Somoza and Coberly
or was used as Ponzi payments to lull and ensnare other
investors.  Somoza's personal extravagances, which involved
spending $27 million in less than 18 months, included two
mansions, expensive cars, $500,000 watches, a private staff, a
personal chef, private jet flights, $8 million placed into his
personally owned computer company, Convoii, and many other
extravagances. (Berlowitz Dec. ¶ 11, Exhibit F).

    In short, Somoza demonstrated the kind of arrogance and
dishonesty that caused his victims to lose faith in their ability
to trust others. (PSR ¶¶ 31 to 61).  Many of Somoza's victims
have been ruined financially and have suffered from tremendous
stress and health problems as a result of his fraud.  (Id.).

    With regard to the history and characteristics of the
defendant, defendant does not have any prior criminal history

within the meaning of the advisory guidelines, however, his lack of criminal history grossly under-represents the crimes he has committed since at least 2002.  From 2002 to 2003, defendant engaged in a "prime bank" or bond trading fraud, the RC/Pinnacle fraud, which promised extremely high rates of return.  In reality, defendant and Coberly merely spent the victims' money on their lavish lifestyles.  When the SEC investigated their conduct, rather than coming clean, Somoza merely defrauded yet another investor, Ardinger, to repay the investors from the first fraud.  He also caused false documents to be submitted to the SEC to misled that agency into believing that Somoza had obtained Ardinger's funds through legitimate means.  Somoza's behavior in the SEC investigation of RC/Pinnacle was dishonest, obstructive and resulted in his receiving a very light penalty of a $40,000 fine.

Similarly, defendant's perjurious and obstructive behavior in the Bruinbilt civil litigation which underlies the insurance pool fraud charged in this case, demonstrates he has the history and characteristics of a hardened criminal despite his lack of criminal history.  He will say or do anything to achieve his goals of stealing other people's money and getting away with it.

A twenty-seven year sentence is a sentence that is sufficient but not greater than necessary to meet the factors enumerated in 18 U.S.C. § 3553(a).  Defendant shows absolutely no remorse for his actions and states that investors suffered no loss.  PSR ¶ 75.

1    **B.   <u>18 U.S.C. § 3553(a)(2)</u>**

2       18 U.S.C. § 3553(a)(2) requires the Court to consider the

3    need for the sentence to reflect the seriousness of the offense,

4    to promote respect for the law, to provide just punishment for

5    the offense, to afford adequate deterrence to criminal conduct,

6    to protect the public from further crimes of defendant, and to

7    provide defendant with needed educational or vocational training,

8    medical care, or other correctional treatment in the most

9    effective manner.  The government respectfully submits that this

10   sentence would appropriately promote respect for the law and will

11   deter future criminal conduct from both the defendant and others

12   without being greater punishment than necessary, as well as

13   protect the community.  Defendant has engaged in a massive

14   investment fraud on scale with the largest investment frauds in

15   the United States.  He shows no remorse for his criminal behavior

16   and continues to blame others for his predicament.

17   A twenty-seven year sentence of incarceration is therefore

18   appropriate in light of the considerations discussed above.

19   **C.   <u>18 U.S.C. § 3553(a)(6)</u>**

20      18 U.S.C. § 3553(a)(6) requires the Court to minimize

21   sentencing disparity among similarly-situated defendants.  In

22   recent history, white-collar criminals like defendant, who have

23   used sophisticated means and who have had managerial roles in

24   multi-million dollars fraud schemes with scores of victims, have

25   received very lengthy sentences.  Therefore, a twenty-seven year

26   sentence for defendant is both appropriate and consistent with

27   sentences of other similarly situated defendants.

28

**D.    The Remaining 3553(a) Factors Also Support The Sentence
       Requested by the Government**

18 U.S.C. § 3553(a)(3) requires the Court to consider the
kinds of sentences available.  Probation is not appropriate given
the nature of defendant's offense.  18 U.S.C. § 3553(a)(4) and
(5) now merely require the Court to take the sentencing
Guidelines as "advisory."  Finally, 18 U.S.C. § 3553(a)(7)
requires the Court to consider the need to provide restitution to
the victims of the offense.  Although the $44.4 million
restitution owed is a significant issue in this case, it is
highly unlikely that defendant has the ability to earn sufficient
<u>legitimate</u> income to pay any appreciable restitution during his
lifetime.  Indeed, it is unclear that Somoza has ever had any
legitimate source of income.  Thus, the public interest in
satisfying the other 3553(a) factors of obtaining a sentence that
reflects the seriousness of the offense, promotes respect for the
law, provides just punishment, affords adequate deterrence, and
protects the public from further crimes of defendant outweighs
any interest in having defendant escape incarceration to earn
minimal amounts for payment of restitution.

**VI. CONCLUSION**

For all the foregoing reasons, the factors set forth in 18
U.S.C. § 3553(a) support the imposition of a twenty-seven year

sentence of incarceration, a five-year period of supervised
release, a $1,900 special assessment and a restitution order of
$44,495.969.

DATED: October 26, 2009          Respectfully submitted,

                                 GEORGE S. CARDONA
                                 Acting United States Attorney

                                 CHRISTINE C. EWELL
                                 Assistant United States Attorney
                                 Chief, Criminal Division

                                 ____/s/_____
                                 JILL FEENEY
                                 RUTH C. PINKEL
                                 Assistant United States Attorneys

                                 Attorneys for Plaintiff
                                 United States of America